## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OWENS BROWN, | ) | 11-cr-10206-DPW |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States hereby submits this sentencing memorandum in support of a sentence of 188 months for Defendant Owens Brown (hereinafter, "the defendant") in the above-captioned matter.  As described below, the Guidelines call for a sentence of 235-293 months in prison for this defendant.  The parties have submitted a binding plea agreement for the Court's consideration that calls for a sentence that is not less than 120 months (the mandatory minimum) and not more than 188 months in prison.  The agreement asks the Court to impose a sentence below the Guideline Sentencing Range (GSR).  The grounds upon which the government seeks this variance reflects the extent to which the government values protecting the identities of the five cooperating witnesses involved in this case.  The defendant is scheduled to be sentenced on October 18, 2012.

## I.   Background and Evidence[1]

---

[1]    The information provided below was obtained through the investigation by the Boston Police Department and the Federal Bureau of Investigation.

From March 2007 through May 13, 2011, members of the Federal Bureau of Investigation ("FBI") and the Boston Police Department ("BPD")investigated the charged offense through consensually recorded telephone calls, controlled purchases of cocaine base, physical and video surveillance, recorded jail calls, court-authorized Title III wire interceptions, firearm and drug seizures, and witness interviews.

The investigation began when members of the FBI and BPD received information that the defendant was distributing drugs in and around the Academy Homes Housing Development in the Roxbury section of Boston.  The information included the fact that Brown headed up a group of individuals, collectively referred to as the Academy Homes Street Gang,[2] and enlisted them to assist him in his drug trafficking activities.

After receiving this information investigators made use of two cooperating witnesses (CW-1 and CW-2).  CW-1 attempted to purchase four ounces of crack cocaine (112 gr) in March of 2007. On March 5, 2007, recorded calls were placed to the Defendant

---

[2]     The government has attached, as Exhibit A, the transcript from the Detention Hearing held on June 22, 2011, in support of its position that the defendant was not only a member of the Academy Homes Street Gang, but also the leader.  This position is based, not on "unsupported speculation or on statements of cooperating witnesses" as stated by the defendant in his objections to the PSR, but on the opinion of Detective Gregory Brown, who has had numerous encounters with the defendant and has been a member of the Boston Police Department for over 24 years.  See Addendum to PSR at 37.

setting up the transaction for the following day (March 6, 2007).
However, when CW-1 showed up to complete the deal CW-1 was robbed
when an individual believed to be associated with the AHSG got
into the CW's car, put a gun to his/her head and went through
his/her pockets.  Although the defendant was charged in
connection with the robbery the charges were ultimately
dismissed.[3] No one was ever prosecuted for this offense.

CW-2 successfully purchased crack cocaine from the defendant
and two of his associates, identified as Lamarr Axell and Darius
Washington on two separate occasions.  The first transaction took
place on April 23, 2008.  Prior to that date, on March 26, 2008,
CW-2 placed a call to a telephone used by the defendant, this
call was answered by Lamarr Axell who told CW-2 that he couldn't
supply CW-2 until "O" was available ("O" is a nick name for
BROWN).  On April 23, 2008, CW-2 called the defendant and
arranged to purchase one ounce of crack cocaine from the
defendant in Academy Homes Housing Development.  Following the
call, CW-2 went to Academy Homes and got into a vehicle belonging
to the defendant.  A second individual identified as Lamarr Axell
was seated in the driver's seat and the defendant was seated in

---

[3]     As set forth in the Affidavit for Authorization to
Intercept Target Telephone #1, the defendant was arrested by the
Boston Police forty minutes after this robbery.  Two cellular
telephones were recovered from him following his arrest.  Toll
records for one of the telephones showed that the defendant's
telephone was in contact with Obie Graham, one of the suspected
gunmen, twice in the sixteen minutes preceding the robbery.

the passenger seat.  CW-1 handed $1100.00 to Axell and the defendant handed CW-2 approximately one ounce of crack cocaine. The drugs purchased were tested by the DEA Northeast Laboratory, found to contain cocaine base, and weighed 25.9 grams.

The second controlled buy took place on May 1, 2008.  On that date CW-2 again called the defendant and arranged to meet him in the Academy Homes Housing Development to purchase two ounces of crack cocaine.  When CW-2 met the defendant in the housing development the defendant told CW-2 that the police were in the area so he had "D" waiting in a nearby parking lot with the drugs.  CW-2 walked over the an individual identified as Darius Washington, who handed CW-2 approximately two ounces of crack cocaine in exchange for $2000.00.  The drugs purchased were tested by the DEA Northeast Laboratory, found to contain cocaine base and weighed 63.6 grams.

As the investigation continued members of the Boston Police Department monitored the drug dealing activity of Academy Homes gang members, but were unable to conduct any further controlled purchases from the defendant or his associates.

Following his arrest for driving with a suspended license on January 20, 2010, the defendant was incarcerated in the Suffolk County jail from February 2 to February 26, 2010.  All calls by inmates at that institution are recorded.  The recording system employs pre-recorded notifications to the initial participants in

the calls that the conversations can be monitored and will be recorded.  The FBI issued an administrative subpoena and subsequently obtained from the Suffolk County Sheriff's Office three CDs containing recordings of all the calls the defendant made using his authorized PIN number while incarcerated.  The CDs contain a total of 112 calls.  The overwhelming majority of these calls were to three telephone numbers used by three women: 857-492-5079 (Chante Devon Carney); 857-399-7047 (Tamara Ayala); and 617-909-1301 (Zelalem Endale).  The defendant would instruct the women to place a "three way" call to one of his associates (frequently Lamarr Axell and Shawn Peete) so that the defendant could continue to direct the collection of drug proceeds from various customers to include co-defendant, Archie Allen.  These jail calls were used to identify a telephone number used by Lamarr Axell.

In June 2010, investigators applied for and received court-authorization to monitor calls to and from Axell's telephone.  However, as soon as the interceptions began the once active telephone seemed to go cold.

In December 2010, investigators were able to identify another telephone number used by Axell and one used for an individual named Hannibal Holliday.  Again, they applied for and received permission to intercept these phones and once they began intercepting telephone calls identified two phone numbers used by

the defendant.

In January 2011, investigators applied for and received court authorization to intercept calls to and from (857) 205-9893, subscribed to in the name of Tamara Ayala, 137 Tonawanda Road and (857) 277-4399, subscribed to in the name of Mark Smith with no known address.  Both of these telephones were used by BROWN to conduct drug transactions.

Based on intercepted telephone conversations investigators were able to make crack seizures from two drug customers of the defendant's: Abayomi Mitchell on April 20, 2011 and Archie Allen on April 25, 2011.

    a.   <u>April 20, 2011 Seizure</u>

The following are summaries of calls intercepted on Wednesday, April 20, 2011, the day of the seizure:

<u>11:05 a.m.</u>- A male, later identified as Johnson, called BROWN.

<u>11:12 p.m.</u> - BROWN called Tamara Ayala ("Ayala") and asked her to bring some "sneakers" to "Flu's."  Ayala asked, "L's?" BROWN replied, "Oh my God."

<u>11:36 p.m.</u> - BROWN called Ayala and again told her to bring "sneakers" to Flu.  Ayala told BROWN that she didn't understand his talk and didn't want to bring anything to "Flu."  They agreed to meet at 1:00 p.m.

<u>11:57 a.m.</u> - Johnson called BROWN and the two agreed to meet

on Ruggles Street in Roxbury in fifteen minutes.

12:17 p.m. - Johnson called BROWN to see where BROWN was located.  BROWN informed Johnson that he (BROWN) was on "Mass Ave."  Johnson replied, "Alright, we'll go outside.  What you want for it anyway?"  BROWN responded, "Ahhhhhhh I'll see you when I get right there."

12:24 p.m. - BROWN called Johnson and told him (Johnson) that he (BROWN) was outside.

12:32 p.m. - Johnson sent BROWN a text message that read, "k."

12:39 p.m. - Ayala called BROWN who stated that he was pulling up to her house.

12:44 p.m. - BROWN told Ayala to open the door.

Following this series of conversations surveillance agents observed the defendant at 137 Tonawanda Street, the residence of Tamara Ayala, one of the defendant's girlfriends and used by the defendant as a drug stash house during the course of the investigation.

12:53 p.m. - BROWN called Johnson and stated that Johnson would have to "come and grab it this way, man."  They agreed to meet and Johnson told BROWN, "we're gonna have to get on the bus that shit's gonna, I'm like yeah, I'm gonna hop on the 23."  Johnson stated that he would call when he got close.

1:03 p.m. - Johnson called BROWN who stated that he would be

-7-

at the "KFC."

At approximately 1:30 p.m. surveillance agents observed Johnson get off the number 23 bus and walk into the Kentucky Fried Chicken ("KFC") located at 465 Washington Street, Dorchester.  Once inside the KFC Johnson called the defendant four times within one minute.  The defendant did not answer any of the telephone calls.  During one of the calls monitors could hear Johnson complain to a second individual that the defendant made him (Johnson) go to KFC for nothing.  Within minutes surveillance agents observed Johnson leave KFC with a man, later identified as Abayomi Mitchell.

1:38 p.m. - BROWN called Johnson and gave Johnson directions to 137 Tonawanda Street.  Johnson told him, "Alright we're walking down now look out for me."

Surveillance agents positioned in the area watched Johnson and Mitchell walk to 137 Tonawanda Street where both men entered the residence.  Approximately two minutes later both men left the residence went to 166 Rosseter Street where they entered a rear, basement door.  Surveillance agents tried to open the door approximately one minute later and found it locked.

1:52 p.m. - Johnson texted "k" to BROWN.

At approximately 1:57 p.m., surveillance agents observed Mitchell open the rear basement door of 166 Rosseter Street and look around for approximately four minutes before closing it.  At

approximately 2:03 p.m., a male identified as Stephen Kimble knocked at the rear basement door of 166 Rosseter Street. Mitchell opened the door, spoke with Kimble and then let Kimble enter.  Surveillance agents watched Mitchell leave 166 Rosseter Street at approximately 2:05 p.m., pat his coat below the breast on the left hand side, stop momentarily, and then remove his hand.  Surveillance agents watched Mitchell get on the number 23 bus and ride to 1191 Dorchester Avenue when he got off the bus.

At approximately 2:20 p.m., BPD Officers Jesse Goff and Matthew Ryan were asked by members of the investigative unit to stop Mitchell.  Officer Goff was told that Mitchell had just come from a known drug location and possibly had a quantity of cocaine on him.  Officer Goff stopped Mitchell at 1191 Dorchester Avenue and conducted a pat-down.  Officer Goff felt an object which he recognized as crack cocaine in Mitchell's jacket pocket.  When Officer Goff retrieved the object he discovered that it was approximately 62 grams of crack cocaine.  The substance seized was weighed and tested and found to be 61.9 grams of cocaine base.

b.  <u>April 25, 2011 Seizure</u>

The following are summaries of calls intercepted on Monday, April 25, 2011, the day of the seizure:

<u>4:41 p.m.:</u> BROWN received a text from an individual identified as Archie Allen, Sr. that read, "What gravy nsby?"

<u>4:57 p.m.:</u> BROWN received a text that read "call me."

<u>5:06 p.m.:</u> BROWN called Allen who said, "What's the dilly?"
BROWN said, "Ah fuckin, bout to be at Bald Head's (nick name for
Lamarr Axell)."  BROWN continued, "You ain't fuckin put nothing
on that blank CD."  Allen said, "huh," and BROWN repeated, "I
said you ain't finished wit that blank CD."  Allen said, "Yeah,
that's why I'm callin you now."  BROWN said, "Aight, I'm bout to
be at Bald Head's . . . I'll be there in like twenty minutes."
Allen said, "Shit, I'd been waitin' for you to call me or should
I make a move?"  BROWN replied, "Make a move, twenty minutes."

<u>5:14 p.m.:</u> BROWN received a call from an individual
identified as Shawn Stephens.  BROWN had spoken to Axell about
Stephens having problems with the apartment at 108 Devon Street.
BROWN asked, "You still in trouble nigga?"  Stephens said, "Yeah
he talkin shit …he talkin to me ..UI..what happened …" BROWN
asked "What happened?"  Stephens explained, "Y'all was in da the
kitchen and my cousin came up. Didn't he?"  BROWN said, "Fuck no.
Hell no."  Stephens asked, "No one came up in upstairs when y'all
was in the kitchen?"  BROWN replied, "Nah, them niggas were
fuckin eatin and blowin it down nobody came up there hell no he's
lyin nigga."  Stephens said, "My cousin came up an he seen, he,
he, he was sayin somthin I don't know if he was he was
lee-(coughs) looking through the crack or somthin he was like yo
somthin 's up there goin on fishy I don't know what's goin on but

-10-

they doin somthin up there in the kitchen." BROWN said, "ohhh auuu niggas eatin and blowin it down he's bullshittin yo yo is he there now though?" Stephens said, "Huh?" and BROWN repeated, "Is, is ummm, your Uncle there now?" Stephens said, "Yeah he's here now." BROWN said, "Damn I needed to swing by." Stephens said, "He's here. I mean you can come but . . ." BROWN said, "On the dolo, I just need to grab my jacket that I left in there." Stephens said, "Yeah." BROWN said, "Aight, I'm call you when I get downstairs." Stephens said, "Where's you want me to bring it down to you ? Or you comin up?" BROWN said, "Yeah, yeah, don't matter I'm gonna call you when I'm downstairs." Stephens said, "Aight call me when you get down…where's this your coat at?" BROWN said, "Probably in the little (or livin) room. I'm just gonna call you when I'm downstairs."

    <u>5:49 p.m.:</u> BROWN sent a text to Allen that said, "Ok." Allen replied a minute later with the symbol for a smiling face ":-)."

    At 6:00 pm, Officer Brito observed the defendant exit a white BMW (RS522P) and enter 108 Devon Street as the white BMW left the area. BROWN was wearing a gray t-shirt. At 6:30 pm, Brito observed Allen's green Pontiac (91PW62) park near 108 Devon and Allen exit the vehicle.

    <u>6:31 p.m.:</u> BROWN received a text from Allen that read, "Here." BROWN replied by text that read "in."

At the same time, Brito observed Allen at the front door of 108 Devon Street.  At 6:34 p.m., a pole camera captured Allen entering 108 Devon.  Two minutes later, BROWN and Allen exited.  BROWN entered his convertible BMW (RSC669) and left the area.  Allen got back in his Pontiac and was followed by a surveillance team to the corner of Hampden and Albany Streets.  Detectives Paul Murphy and Marty O'Malley and Trooper Walter Foley observed Allen drive through a stop sign at Hampden and Norfolk.  They then observed Allen stopped at a red light at Hampden and Melnea Cass and observed the back left brake light out.  They conducted a traffic stop on Hampden and Albany.  Allen appeared nervous and O'Malley asked if any weapons were in the vehicle.  Allen said no, he was nervous because he had cocaine in his wallet.  O'Malley gave Allen <u>Miranda</u> warnings which Allen said he understood and Murphy asked if Allen had any more drugs.  Allen slumped his head and said he had cocaine in his pocket.  O'Malley then recovered crack cocaine from Allen's right front pocket.  The substance seized was weighed and tested and found to be 85.7 grams of cocaine base.

Wire interceptions and surveillance conducted during the investigation, as set forth above during the April 20, 2011 surveillance, demonstrated that the defendant used 137 Tonawanda Road, apartment 1 as a stash location for crack cocaine.  On May 13, 2011, investigators executed a search warrant at the

residence and recovered 34.6 grams of cocaine base from a shoe box located in the back hallway.  This apartment is rented by Tamara Ayala.  During the investigation the defendant was frequently intercepted directing Ayala to bring drugs and money to various locations.

Wire interceptions and surveillance conducted during the investigation demonstrated that the defendant used 108 Devon Street, apartment 3 as a "base of operations" for his drug dealing activities and would direct the residents of the apartment, Lamarr Axell and Shawn Stephens, to both store and run drugs and drug proceeds for him.  In addition to the conversations intercepted surrounding the April 25, 2011 seizure from Allen, a sample of conversations demonstrating the defendant's use of and connection to 108 Devon Street, apartment 3 is set forth below:

March 10:

5:11 p.m.: BROWN received a call from Allen, a/k/a "Glasses."  Allen asked if he was at "the spot" and BROWN said Allen could go to L's (a nick name for Lamarr Axell) place and see Swine Flu (a nickname for Shawn Stephens) if he wanted.

5:13 p.m.: BROWN called Stephens and asked where he was and Stephens said he was at the house.  BROWN said, "Glasses bout to come to, over there and um give you this fuckin change this nigga owe me."

Surveillance confirmed that Allen entered 108 Devon Street at approximately 5:30 pm.

5:30 p.m.: BROWN received a call from Stephens who told BROWN that he (Allen) left it at his crib.  BROWN said "that nigga is dumb."  A minute later Allen called BROWN and said that he left the item in his other coat.

The next day, March 11, several intercepts among the same three numbers showed that the defendant was coordinating a meeting between Allen and Stephens at 108 Devon Street. Surveillance confirmed that Allen entered 108 Devon Street in the afternoon.

4:59 p.m.: BROWN received a call from Stephens who stated, "He gave me, uhh."  BROWN cut him off and said, "I know." Stephens said,  "No, but a ten-dollar too."  BROWN said, "Ten Dollar?"  Stephens said, "Yeah. So I guess the ten is for me? [laughs]" BROWN replied, "I don't know what the hell, I don't know.

March 13:

8:15 p.m.: BROWN received a call from Stephens.  During the conversation BROWN told Stephens he would be at the crib in an hour.

9:06 p.m.: BROWN received a text message from Allen that read, "What good bro."

9:10 p.m.: BROWN received a second text from Allen that

read, "Yo shit daddy."

9:11 p.m.: BROWN sent a text message to Allen that said, "I'll b there in 10min."

Via a pole camera, agents confirmed that the defendant and Allen subsequently met at 108 Devon Street.  Thereafter, while Brown and Allen were still in 108 Devon, the defendant called Stephens and asked where "it" was at.  Stephens told the defendant it was hanging in a bag at the foot of his bed.  The defendant was unable to find it and Stephens corrected himself and said it was in the closet.

9:43 p.m.: BROWN received a call from Stephens who said, "Yo, go in the closet. My little closet in my room."  BROWN replied, "It ain't there."  Stephens continued, "Reach onto the left on that . . . like . . . towards the floor. On top of the clothes just . . . there's a can right there."  BROWN expressed frustration and said there was nothing there.  Stephens said, "Dude, look under the bed right where you're at. I forgot where I put it" and then later said, "It got to be in that closet man."  Finally, BROWN said "alright, alright, alright" and indicated he got it.  Stephens said, "See I hadn . . . I knew I wasn't fucking stupid."  BROWN said, "You just smoke too much weed."  Stephens said, "Nah, I knew where I had it."

On May 13, 2012, investigators executed a search warrant at 108 Devon Street, apartment 3.  Crack cocaine was found in one of

the bedrooms.  The drugs were sent to the DEA New England Regional Laboratory where they were weighed and tested.  The drugs tested positive for the presence of cocaine base and weighed a total of 51.32 grams.

Ultimately, the defendant distributed more than 2.8 kilograms of cocaine base during the scope of the conspiracy and did so through the use and direction of more than five individuals, to include Lamarr Axell, Darius Washington, Shawn Stephens, Tamara Ayala, and Shawn Peete.

The basis for the drug weight determination is set forth below[4]:

| Controlled Buys | | | |
|---|---|---|---|
| March 5-6, 2007 | CW-1 | 4 oz of crack = 112 g | CW robbed |
| April 23, 2008 | CW-2 | 1oz of crack = 28 g | 25.9 gr cocaine base |
| May 1, 2008 | CW-2 | 2 oz crack = 56 g | 63.6 gr cocaine base |
| | | | |
| Seizures During Wire | | | |
| April 20, 2011 | Mitchell | sold by D from 137 Tonawanda | 61.9 gr of cocaine base |
| April 25, 2011 | Allen | sold by D from 108 Devon | 85.7 gr cocaine base |
| | | | |

---

[4]     The drug weight is based on the drugs seized during the course of the investigation, the conversation intercepted over the wire and the interpretation of that conversation by investigators involved in this case.

| Seizures from Search Warrants | | | |
|---|---|---|---|
| May 13, 2011 | Stephens | 108 Devon Street | 51.32 gr cocaine base |
| May 13, 2011 | Ayala | 137 Tonawanda Road | 34.6 gr cocaine base |
| **TOTAL** | | | 435.02 (includes agreed upon sale of 3/6/07) |
| | | | |
| **Totals from Wire** | | | |
| January 13-18, 2011 | Gonzalez | text "175," | $17,500 = 500 grams powder = 17 oz crack = 476 gr crack (conservative) |
| January 18, 2011 | Allen | calls for $2k, physical surveillance on 1/19/11 show deal | 2 oz crack = 56 gr crack |
| January 25, 2011 | Allen | D has product, 1/31 get together, Allen having a hard time moving product; 2/6 D calls Axell to get product for Allen | 1 oz crack = 28 gr |
| February 21, 2011 | Allen | finished one, but not the other | 1 oz crack = 28 gr |
| February 24, 2011 | Allen | Allen and D trying to get ready for a deal, discuss "1 stack" | 1 oz =28 gr |

| | | meet | |
|---|---|---|---|
| March 13, 2011 | Allen | make it happen, got "five" now, discussion with Stephens about bag in his room, surveillance puts Allen at 108 Devon | delivery of $5000 = 4.5 oz crack<br> picked up 1 oz crack<br><br>154 gr crack |
| March 10, 2011 | Allen | Allen drops off money to Stephens | $1000 = 28 grams crack |
| March 20, 2011 | Allen | discussion about $5000 | 126 gr crack |
| January 14, 2011 | T. Brown | discussion about ½ and getting paper together | 500 gr powder = 17 oz crack = 476 gr crack |
| April 9, 2011 | Flores | D needs to supply Waiters, stopped with $7500 | 9 oz = 252 grams crack |
| | | | |
| **GRAND TOTAL (4 YEARS)** | Allen - 4 year customer of BROWN's | (seizure + wire calls) x4 = 533.7 x 4 = 2134.8 | 2134.8 gr crack |
| | wire (w/o Allen) | | 1204 gr crack |
| | seizures (w/o Allen or Stephens) | | 289 gr crack |
| | Stephens - 1 year customer of BROWN's | (seizure + info that Stephens was supplied by Brown for a year .5 - 1 oz crack 1-2 times a month for 6 mos; and 3-4 oz of crack 1-2 | 639.32 gr crack |

|  |  | times a month for 6 mos.) |  |
|  |  |  | **4267.12 gr crack** |

## II.   Guideline Calculations

Under USSG § 2D1.1(a)(5), the Base Offense Level in this case is 36.  With applicable enhancements under § 3B1.1(a), as described below, the Adjusted Offense Level is 40.  Applying a 3 level reduction for acceptance of responsibility under § 3E1.1(a) and (b) based on defendant's guilty plea, the resulting offense level is 37.  The defendant has a total criminal history score of 2, therefore his Criminal History Category is II.  The recommended guideline sentence for this offense is therefore 235-292 months.

## III. The Plea Agreement

The parties have submitted a "binding" plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C) to the Court.  In the agreement the parties agreement with the Guideline Sentence Recommendation set forth by probation.  Additionally, the parties agree that an appropriate disposition in this case would be incarceration for a period of no less than 120 months and no more than 188 months.  While this sentencing range reflects a downward variance from the GSR the government believes it is appropriate because the government has not disclosed the identities of five cooperating witnesses.  Additionally, the government believes

-19-

that a sentence of 188 months incarceration is sufficient, but not greater than necessary to achieve the goals set forth in 18 U.S.C.§ 3553.

## IV.   **Potential Mitigating Factors**

The sentencing in this case must also consider any mitigating factors as advocated by the defendant in his objections to the PSR.  While it is unclear exactly what issues the defense will raise, there are certain factors the government would like to address.  These arguments do not, in any way, suggest that the government is advocating for a sentence above the agreed upon recommendation set out in the plea agreement. The government believes that a 188 month sentence is the right sentence in this case.

### A.   **Drug Use**

Serious addiction or other drug-related problems may properly affect post-<u>Booker</u> sentencings.  On the one hand, they may make a defendant less culpable if he committed crime to feed a drug habit.  At the same time, they may make recidivism more likely because of the grave potential that the defendant will relapse upon release and engage in still more crime.

Here, the defendant reports alcohol, marijuana, cocaine, ecstacy, and prescription pill abuse. PSR at ¶¶150-156.  Yet, the record also shows that the defendant is responsible for supplying kilograms of crack cocaine to areas of Boston devastated by the

widespread distribution and abuse of drugs for years.  Moreover, the manner in which the defendant operated his drug distribution business demonstrates a deliberate indifference to those around him.  In short, the defendant used everyone he came in contact with to protect himself from apprehension and eventual prosecution.  This is not the workings of a addict forced into criminal behavior to feed an out of control addiction, but of an individual engaged in deliberate planning and manipulation of those around him.  While the government will join in a recommendation for drug treatment while in prison and believes that the defendant's supervised release should include drug treatment, drug testing and a referral to the RESTART Program, this is not a basis for any further sentence reduction.

## B. **Exposure to Violence**

This is also not a case in which the defendant's exposure to violence should counsel for a sentence below the government's recommendation of 188 months.  While it is a horrific truth that many children who grow up in urban areas are subjected to acts of violence it does not follow that they aspire to be gang leaders or the head of a drug distribution group.  In this case the defendant wasn't just haunted by the experiences of his youth, but rather celebrated them.

Defendant makes reference to seeing a child killed as a warning to others not to cooperate with law enforcement and the

government anticipates that he will use it as justification for the imposition of the mandatory minimum sentence. <u>See</u> Addendum to PSR at 39. However, any argument for additional leniency rings hallow when one takes into consideration the tattoo on his right shoulder depicting a rat crossed out with the words "I will never tell" above it. Notably, the defendant refused the comment to probation on the tattoo's undeniable significance. <u>See</u> PSR at 139.

In addition, the government has attached copies of several exhibits admitted into evidence at the defendant's detention hearing. These photographs depict the defendant with numerous firearms to include the handgun recovered from his mother's residence on the day of his arrest. <u>See</u> Exhibit B, C, D. Finally, the government has attached a police report, also admitted into evidence at the defendant's detention hearing, that identifies his involvement in the shooting of a rival gang member, Orlando Watters. <u>See</u> Exhibit E.

## V.  <u>Supervised Release</u>

The government also believes that the defendant should be placed on supervised release for the statutory minimum period of five years and that his supervised release should include special conditions designed to ensure that the defendant does not revert to his past ways and will thereby protect the community and the defendant from himself.

The government is therefore recommending the following special conditions be included in his supervised release:

**A.    The defendant should be ordered to stay away from the Academy Homes Housing Development**

While the defendant has informed probation that he has no plans to return to the Boston area upon release, the defendant should be ordered to stay away from the Academy Homes Housing Development for the first three years of his Supervised Release without the express consent of his probation officer.  See PSR ¶123.  The purpose of this restriction is to keep the defendant in a new environment where there will be fewer opportunities to commit crime and see associates who would be amenable to buying or selling drugs. See Cullen, "Environmental Corrections – A New Paradigm for Effective Probation and Parole Supervision," 66 Federal Probation 2, 28-37 (Sept. 2002) ("[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . .reduce the extent to which offenders are tempted by and come into contact with opportunities for crime.").  These restrictions simply make sense in this case where much of the troubles the defendant has experienced are specifically related to the area in which he has spent time and compatriots are likely to be found. A map detailing the proposed exclusion zone will be provided to the court at sentencing.

### B.   Curfew

The government also recommends that the defendant be subject to a 9 p.m. curfew for the first year of supervised release to help his transition.  This restriction should be subject to modification by his Probation Officer for work or other programming.

### C.   Associational Restrictions

Again, although the defendant has no plans to return to the Boston area upon release, the defendant should be ordered to stay away from the attached list of individuals identified by the Boston Police Department as members of the Academy Homes Street Gang for the first three years of his term of Supervised Release. As with the geographic restriction, this restriction is designed to assist the defendant in successful completion of his period of supervised release.  A list of individuals will be provided to the court at sentencing.

### D.   Other proposed conditions

The government asks that the court make a judicial recommendation of the RESTART Program, and that the defendant be provided with drug treatment and testing and any and all available vocational training while on supervised release.  The government will also join in any request for mental health counseling either while incarcerated or after the defendant is placed on supervised release.

**VI.** **Conclusion**

Therefore, the government respectfully requests that this Court adopt the sentence recommended by the Probation Office.


Respectfully Submitted,
CARMEN M. ORTIZ
United States Attorney


By:  /s/ Emily Cummings
EMILY CUMMINGS
Assistant U.S. Attorney
One Courthouse Way, Suite 9200
Boston, MA 02210

CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


Dated: October 11, 2012.

/s/ Emily Cummings
Emily Cummings
Assistant U.S. Attorney